This is 21-29-12, Hunter v. City of Philadelphia. Whenever Council is ready. May it please the Court, my name is John McClam, Counsel for the Appellants, Mr. Darris Hunter and Ms. Kenya Shuja. I'd like to request three minutes for a vote. I'm going to be discussing the marijuana issue. My colleague, Mr. Costigan, is going to be discussing the medical records issue. First, I plan to talk about how the trial court used its discretion in finding that the marijuana use evidence was relevant under Rules 401 and 402. Before we get to that, I have a bunch of questions, but they're largely procedural. First of all, and I have the order of January 22, 2020 in front of me, that's all we have in terms of the Court's reasons or even the positions of the parties expressed to the Court outside of the submissions, the memos that were presented on these two evidentiary issues. Does the motion eliminate filings and the decision? I understand, having been a district judge for a lot of years, that a lot of Rule 16 conferences are not conducted on the record. That includes some that would be called pretrial conferences. In a sense, they're all pretrial conferences. Here, what we have are rulings and motions to exclude evidence that necessarily are going to implicate Rule 401, Rule 403, and yet we have no record, do we, as to how the district court went about weighing under Rule 403. That's exactly right, Your Honor. Did you request an on-the-record hearing? We did, I believe in our motion to eliminate filings request oral argument. I believe our briefs requested oral argument. Well, there was oral argument, wasn't there? No, Your Honor. Okay. There was never an argument on these decisions. There was a motion to eliminate, an opposition, and a decision for each of them. And there's case law on this about when all the trial judge does is essentially read the text of Rule 403. I wrote that opinion. That's a completely different situation. That happens. That wasn't on-record proceeding, as I recall it. I think it was a sidebar. But that was where the district court didn't get into the reasons. Here, what we have is no on-record proceeding. That's different. We have no reasons. We have no weighing because we've got no record to look at, right? Right. But you didn't press to have that. I mean, can you point anywhere to the record where you made a request that there be an evidentiary presentation, or some formal presentation, rather, to consider that evidence? No. I think there was a couple places on the record, a trial for the amount of records, for example, where the court said, no, we're not going to get into that because of my ruling. But in terms of whether there's been some kind of waiver, which is what I think you're getting at, under Rule 104B, it's very clear that when there's a final ruling on a motion to eliminate, there doesn't need to be another offer of proof. There was nothing in either of those rulings that suggested the court was going to be willing to reconsider its decisions. So is our view here, our perspective filter, should I say, is an abuse of discretion? Yes, it is an abuse of discretion. Although I think in getting at the Caldwell decision, when there's not a lot of description of how the judge used its discretion, it's entitled to less deference here. And when you look at the decisions, I think it's pretty clear that they were arbitrary and it was an abuse of discretion. Well, I mean, I'm trying to figure out, really, this is bizarre. There's a ruling that the evidence of marijuana usage, which I believe, and would you please pronounce her name for me? Shuja. Ms. Shuja testified, I believe, that she smoked marijuana four to five times a week? That's correct. With her husband or with her cohabitant? Okay. Did the district court have that information at the time this order was entered? There was the deposition testimony that she used marijuana regularly in her pregnancy, about the same, yes. More importantly, did the district court have, at the time of his January 22, 2020, ruling, the medical reports of the doctors who testified? So when defendants moved to exclude those records, they did not attach them to the motion in lemonade, but they had been filed on the docket already in the summary judgment proceedings, so they were before the court. But the defendants, of course, who had the burden to exclude the evidence, didn't actually attach it. We have a record here where both medical experts, that is, a medical expert for the plaintiff and a medical expert for the defendant, says that the marijuana usage had no effect on the miscarriage. So what possible relevance could the marijuana evidence ever have had under Rule 401? I think the answer is it didn't. Did you ever move to strike once that's in? I mean, was everybody surprised when the defense expert testified, as he did, consistent with that Dr. Cohen had testified? I think, sure, that was a surprise. We knew before. Did you ask for a cautionary instruction since, you know, as I understand relevant evidence, this had no relevancy at that point. Whether or not it was harmless or whether or not it was prejudicial is another question, and I'm sure we'll hear about that. But it seems to have absolutely no relevance once the defense-owned medical expert says it had no effect. Well, first, there was no relevance at the time of the motion of the MLA. But at trial, when that came out, there had already been the defendants had amended their expert report by email, essentially saying that it could be a risk factor, and he counsels against their clients or patients using marijuana. At what point was that, Brian? Excuse me? At what point did that happen? It was after a pretrial conference. Before trial. Before trial, yes. And was that the citation to the NIH study? No, that was in the motion to eliminate opposition, was the citation to the NIH study. At what authority was it a risk factor? And at what gestational age was it a risk factor? What was the authority to say it was a risk factor when you've got both experts saying it wasn't a factor in this case? And if it was a risk factor, at what gestational age did it rise to the level of creating a risk? Well, I think the risk factor we're talking about here is completely undefined. It's a vague risk factor that OBGYNs, for example, tell their patients they shouldn't do a lot of things. And a lot of those things don't have anything to do with miscarriage. They could be to do with the health of the mother or something else, but it was never tied to a miscarriage. Well, but that's why, again, I'm just flummoxed by the fact that I have so many questions for both sides about things they did and things they didn't do. And why you would not, after this evidence is out there, even if it's a surprise, or especially if it's a surprise, ask for some kind of cautionary instruction with respect to this marijuana usage evidence, which appears to me not to have any relevancy at all. It's something I can't quite understand. That's my concern, too. Why wasn't there a request for a limiting instruction? Well, I don't think a limiting instruction is required under 104B. There is no suggestion that's limited. But there's something out there that you're arguing was unduly prejudicial to your client. Right. It's irrelevant, given the record here. So why wouldn't there be a situation where you want to tell the jury, don't use that as evidence at all, in terms of Ms. Shuha's character, whether or not she's a good mother or a bad mother. You can't consider that. It's totally irrelevant, and I instruct you to disregard any testimony you may have heard about marijuana use. Why wouldn't you ask for something like that? I think at the – what the defendant's argument was in the motion to eliminate is that they needed to show it as a risk factor. And they did that just barely in their expert testimony. After the trial court's response, they asked about marijuana use. He said, yes, I consider it a risk factor. So as I understand your position and what happened here, the trial court's the first person, as it were, to introduce marijuana into the trial. Is that right? No, Your Honor. In the defendant's opening, they said Ms. Shuha continued to smoke weed throughout her pregnancy. And then it came up in cross-examination for Ms. Shuha's testimony. They asked her about how many times – you know, you smoke marijuana four to five times a week while you were pregnant. And Mr. Hunter was totally okay with you smoking marijuana while you were pregnant. That's when it came up. And then because of a scheduling issue, the defendant's expert actually testified before plaintiff's expert. And it came up. They didn't ask any questions to their own expert about marijuana use. But the judge raised it and said, did it have any bearing on any of the issues in this case? And the expert said, no, it didn't. And so it wasn't relevant. But it also wasn't – there was nothing different from the motion raised. But it's in the jury's minds. And you think you want to make sure the jury didn't consider that in terms of whether or not this was a lousy mother and we don't like her. Therefore, the city wins, which is an obvious danger in this kind of a case. Right. And that's the tremendous prejudice under Rule 403 that we were concerned of. But there was nothing in the motion or – That doesn't answer Judge McKee's question or my earlier question. And that is, we're not now at a point of whether it's admissible or not. It's already out there. Right. So what you're left with is, do you ask the district court to strike it? Do you ask the district court to strike it and give a cautionary instruction? And yet I didn't see anything in the record that I read suggesting that the plaintiff – that plaintiff's counsel ever even came close to asking for that. I wouldn't – I'm not arguing that we could not have asked for some kind of amendment. I understand. I'm asking why. I'm saying that there is – there's no case law that the defendants have cited to say that you must ask for a – for a cautionary instruction in order to preserve this issue for appeal, which we did. And I'm not asking about preservation either. I'm asking about what happened and what might have mitigated – Whether or not – it may go to whether or not it's harmless error. That's what it seemed to me, as opposed to harmful error. Or I don't think invited error comes in. The facts are not there. But it kind of suggested something similar to the doctrine of invited error. This is not invited error, but it raises that kind of similar speculation, at least in my mind. It's true that whether on the record or off the record, there was never a request for that sort of limiting instruction, correct? There was never a request for limiting instruction. That's – Or to strike. That's correct. Off the record, there were discussions of marijuana and the medical use in the pretrial conferences. But at trial, there was no discussion of a limiting instruction for marijuana use. And this was not harmless error. This case was a case about credibility. It was about what happened that night and who pushed the door. Well, her credibility was probably harmed in front of the jury by virtue of the fact that she'd had no prenatal care for about four and a half months, right? Isn't that the record? Isn't that what the jury heard? Yes, that is the record. I don't think that goes to credibility or their judgment. Well, the jurors would. The jurors sure would. Yeah. That combined with marijuana use, that's clearly a risky run with what's in the juror's mind. Sure. So that had an impact on the jurors. But that doesn't sort of excuse piling on additional evidence that goes to record credibility. That's the question we have to answer. But I don't want you to be putting before us as if the marijuana evidence is simply in a vacuum. We have other aspects about the plaintiff and her personal care and her care of the unborn child up to that point. Sure. I think this was a close case. As defendants wrote in their brief, the jury was out for almost five hours in this case. And there's case law on this. When credibility is a central issue, as it was here, you can't say that it's harmless error when there's an evidentiary error allows an attack on credibility. Five hours is not very long. Technically, you made it sound like five hours was the hook for a long time. Five hours in a case like this, it's not all that long. Thank you. There's no further questions. And I'll turn it over to my colleagues. Morning, Mr. Costigan. Is it Costigan? Costigan, Your Honor. Morning. Morning. May it please the court. My name is David Costigan. As Mr. McClan mentioned, I'll be arguing the medical record. Mr. Costigan, what records, what medical records did you want to get in for the record and go before the jury that you were unable to do? So because Judge Rice did not preclude admission of all medical records, right? So the order says that medical records are excluded under 403.  Because it's granted in part and denied in part when it's permitted to introduce evidence, that would include records, that the miscarriage occurred. So the fact of a miscarriage is going to be before the jury, including testimony by the expert witness that defendants caused the miscarriage. And I read the record. The two medical experts to whom I've referred both refer to the record. So as is perfectly proper under the rules of evidence, the medical experts, I think that's FRA 8034, were permitted to look at those portions of the medical record and rely upon them. What did you want in that you didn't get in? So a number of things. One, as Mr. McClan mentioned, credibility was a central issue in this case. And it was attacked repeatedly by the defendants during the trial. So there are medical records. There's a pen medical record saying that Ms. Shuja experienced cramping, bleeding, and leakage of fluid for several days. The discharge summary? Excuse me? The discharge summary? Yes, that's the pen discharge summary. Why couldn't the plaintiff testify to that? She did testify to that. All right. So the only – sorry. Well, how is she prejudiced at all then? Because her credibility has been attacked throughout this entire trial, including via the marijuana use. Well, now, wait a minute. If – was her credibility attacked as to that specific statement? So if it was as a prior consonant statement, then you could come forward and seek to offer testimony in record form or otherwise that, in fact, there were complaints of this, of bleeding or of spotting or whatever. So I'm at a loss to figure out how you were prevented from putting in evidence of this, even if it included the record. So two things. One, her credibility was attacked by the defendants in terms of whether she made up this whole event. So in their opening – That doesn't automatically allow you to get the medical records in. The fact that her credibility was attacked, as it would have to be to defend the case, that doesn't automatically allow evidence to come in to corroborate her credibility unless you bring it in as evidence of recent – to rebut an assumption of recent fabrication. And that's not what you're saying you're going to use it for. You're simply going to bring it in to bolster her testimony, period, not to rebut recent fabrication. Right. Sorry. How are prior consistent statements admissible? Excuse me? How are prior consistent statements admissible? So these medical records, they could have been brought in as prior consistent statements after her credibility was attacked. That's not enough. That's not enough. You need some intervening event to suggest that her testimony has been compromised. Just because you attack somebody's credibility doesn't allow you to admit prior consistent statements. Right. But the records are admissible in the first instance because they're relevant, and the reason they didn't come in is because they were excluded by this motion and limited ruling. Well, but you've already established the evidence in those records that you wanted to bring in. That came in through her direct testimony. You're saying that it would have been helpful to corroborate that direct testimony. And now we're asking you how do you do that unless the method of attacking her testimony is by alleging that there's recent fabrication. Then you can get it in. Absent some attack based upon recent fabrication, you can't just automatically bolster a witness's testimony. And it sounds like you want to bring in the medical records, at least these medical records, the discharge summary, to bolster her testimony. They wouldn't be admissible for that purpose. So that was they could have also been used by the medical experts in their testimony. Well, they were. They were. They were referenced, but not. Do you agree with me, Mr. Costin, that any counsel, plaintiff's counsel in this case, can't come into court, come forward with a bound set of records from Mercy Hospital in this case, from Penn Hospital in this case, and just say, here, I move to admit the medical records. You can't do that, can you? Right, but we were. And so to the extent that Judge Rice's ruling precluded you from doing that, what was it that you had to do, what was it that you did do, to seek to use certain portions of the record? So we would argue that we were prevented from using the records, not only bringing them into court, but also whenever we tried to introduce them into the trial, we were prevented from asking an expert to read the medical record into the record. Well, that might not be permissible in many instances. It might be just plain hearsay. Or even if it's the hearsay exception that's permitted under 803, did you at any point qualify these as business records under 803-6, I think it is. So, but the reason, there was never an objection. There's hurdles that have to be overcome. You don't just bring a wheelbarrow in with a whole bunch of records in and say, here, these are medical records, I want them admitted. Right. Whenever the judge was excluding the records, he referred back to his motion of laminate ruling, which was on 403. And the defendants never made an objection based on hearsay of these records at trial. So. Maybe we can go to the Bazaar's report. Because it does seem to me that's relevant to, and I've mentioned it before, the gestational age here could be very crucial. But did you ever ask that the record be brought in to establish the gestational age and what may have caused the miscarriage? So, we, I think we were prevented from using it with any of the experts. We were allowed to show them the records, but, again, we weren't allowed to have the records be read into evidence. But there was some discrepancy about whether or not she suffered, or the miscarriage was triggered by, mispronounce it, trisomy 18. Right. And the gestational age becomes relevant to get to the probability of that malady causing, having some determinative impact on whether or not this was an incidence of miscarriage because of trisomy 18 or because of trauma. But you never sought to get the record in, the pathology report, to try to establish. Well, according to the pathology report, the fetus was 18 weeks old at the time, I don't know how to use that, but at the time of the incident. And, therefore, the chances of this being trisomy 18, which is what the defendants are alleging, are drastically reduced. You never tried to use them for that purpose. Right. But whenever we were, whenever we did try to introduce the medical records, as I was saying earlier, we were kind of thwarted by the pathology report. I'm asking you, how did you try to get the pathology report in? That's what I'm trying to figure out. So I think the pathology report. One second. So I'm not seeing it in my notes here, but I believe the pathology report was shown on cross to defendant's expert and that when he was asked about it and asked to read something about it into the record, the judge said, I'm not going to get into what I excluded. Or there was some testimony that was stricken from the record where Judge Rice had indicated that the testifying witness was beyond his area of expertise and competence to testify. And that, I think, had to do with some blood found on the placenta. If I recall correctly, I can't point to where it is in the record, but I do recall that occurring. Yeah, so, sorry, I found it in my notes. But none of that suggests a preclusion of the records being used or of your ability to use the record. And I return again to the order which explicitly said that you would be permitted to introduce evidence that the miscarriage occurred, including testimony by the expert witness that defendants caused the miscarriage because physical injury is a valid component of the Fourth Amendment claim. I mean, at no point was there a blanket refusal on the part of the district judge to say you can't use the medical records. I don't have the order in front of me, but I believe the next sentence says something about how the medical records are unfairly. The probative value of any medical records detailing the miscarriage, photos of the fetus, he was concerned about that kind of inflammatory evidence, or messages about the miscarriage, communication, anything that might emotionally impact on the jury, those were his expressed concerns. And those are what he said substantially outweighed, were outweighed by the likelihood of such inflammatory evidence confusing the jury. Right. This seems to me to suggest considerable flexibility for you to come forward and say, I want to use this particular document. Now, you might then have to go through the business records qualification that the rules of evidence require, but it's certainly not an absolute preclusion from your standpoint. Well, so the way that it was treated at trial, so on JA 242 the court said, quote, I don't want to get into admitting all of these records. All of them include the pictures of the fetus, which is a real problem. Right, but the context of that statement wasn't about all of the records. It was about a very specific record that was shown to a defendant's expert on cross. So we were prevented from using that record. Which record was that? So the transcript was JA 242. I believe it was the pathology report, but I'm not positive, and I don't want to misrepresent which record it was. And then there was another statement by the court on a page earlier where, again, Mr. McClam asked the expert to read the record into evidence, and the court said, no, we're not going to read it into the record. Thank you very much. Thank you, Your Honor. Ms. McNaughton, how are you? Good morning. So Jennifer McNaughton for the city of Philadelphia. Were you trial counsel, Ms. McNaughton? I was not. I didn't think so. I don't know what you mean. No. Can you help us, please, to understand what trial counsel saw as the relevancy of the marijuana usage, at least once it became obvious that the city's own medical expert could not establish any kind of nexus between marijuana usage and the miscarriage? Sure. Well, there's two points at which there could have been some objection or there could have been some request for the court's intervention about the marijuana evidence. That wasn't what I asked. Okay. Just to set the stage. You're arguing waiver. We're not asking about waiver. I've already asked plaintiff's counsel about what they did and what they didn't do. Right. So at the motion and limine stage, so this is before trial, before our expert had gotten up to testify, the defense made a credible showing that the evidence was relevant, based on the citation to the National Institutes of Health website, which summarized risk factors of pregnancy. Was that before the defense had Dr. Holden's report? Dr. Holden's report was focused on trisomy 18. And so that was the basis of his opinion. But he, Dr. Holden, was asked and did testify that the marijuana usage had no applicability in this case. Right. Because he was basing his opinion on trisomy 18. That was the overwhelming cause of the miscarriage. That was the overwhelming focus of the trial. That wasn't the question he was asking. I'm sorry? That wasn't the question that he was asking. It clearly was not the question that Judge Rice asked of Dr. Cohen. And in terms of the NIH study, that specifically talks about risk factors after 20 weeks of pregnancy, because it gets back to the relevance of the gestational age, which then gets into the relevance of the pathology report that was excluded. But, again, I'm struggling with why was marijuana use relevant. Once, even taking the NIH report, which would say that it may be a factor after 20 weeks of pregnancy, and we're not at 20 weeks, we're at 18 weeks. So it's not relevant for that purpose. So why wasn't it relevant at all? So two responses. On the 18 weeks thing, that is Dr. Cohen's theory. He tried to refute the trisomy 18 evidence, which was really compelling. Ninety-five percent of these pregnancies, sadly, end in miscarriage. And they are miscarriage at what point in the pregnancy? Well, that's what's interesting. So Dr. Holden was asked about the 18 weeks theory. He said he was not aware of any data that supported this idea, that there was some sort of a dip in the likelihood of miscarriage during the second semester, or second trimester, excuse me. But more importantly, and I think this panel has already gotten at that point, if there was some sort of a sea change, something happened at trial that altered the balance of prejudicial versus probative effect that Judge Rice did before trial, he was incumbent upon the appellants to object, to say something. Again, you know, we have gone there and maybe we'll go there again, but I cannot understand how, especially given what you've just emphasized for us, that the real debate was trisomy? I've heard it pronounced both ways, trisomy and trisomy. Trisomy and trisomy. I didn't even know of this condition until I read the briefs in this case and then did a minimal amount of research. But if that was the thrust of the defendant's case, why even get into this whole marijuana thing, especially if you had no expert testimony to support a causal nexus between its usage and the miscarriage? Well, before trial, this is when Judge Rice was making this discretionary balancing test. To remind the Court, the standard is abusive discretion. So we made a credible showing that marijuana use, just like all the other risk factors, the maternal age, use of cigarettes, lack of prenatal care, that these were risk factors. This was a high-risk pregnancy. What was that credible showing? Was that the NIH study? Right, right. And only the NIH study? Right. That's what we cited at the time. Which raises a question about, again, the gestational age. My concern with the four or three balances, when you look at the probative impact, the probative possibility, and the prejudicial impact, I'm still looking for something to put on the probative side of the scale and I'm not finding it. If it's not relevant to anything, there's nothing on that side of the scale, so the scale goes like that in terms of prejudicial impact. Well, we did make a showing of relevance. On the NIH study, again, it's circular. I think it's back to the gestational age. And the mythology report, which might lend some support to the gestational age, doesn't come in. Well, the gestational age debate is, as I said, that was Dr. Cohen's theory. Our expert did not agree with that theory. That's a balancing of the battle of the experts. That was flushed out in the testimony of the two experts. Right? I mean, the gestational period of time during which trisomy may matter or may not. Right? So Dr. Cohen had the theory about gestational age matter. Dr. Holden simply concluded that from his knowledge of this condition, it causes miscarriage 95% of the time, and he wasn't aware of any. It was the thrust of your case, wasn't it? Right. What, the trisomy caused the miscarriage? Yeah. Yeah, that was the overwhelming focus of the trial. Again, which is why I'm left with this question about why marijuana should even have come in. Here again is the problem of the gaps in the record and the fact that we don't have any kind of record concerning the motions in limine pre-trial. I have to assume, bolstered by what you've said, that Judge Rice made his ruling based on at least a suggestion, though apparently not a proffer, from the city that there would be some evidence presented at trial concerning marijuana usage. Otherwise, there would have been no reason for this No. 2 Decretal portion of his January 22 order. Right? Yes. Hadn't it come up from your side. So at some point, it has to become apparent, even if it wasn't already apparent, that the thrust of the case, the thrust of your defense, as cause was the treasury, that there was no place for the marijuana evidence here. And not only no place, there was no expert testimony to support even its relevance. Well, what happened at trial, and I think that's why we have to divorce the pre-trial discretionary ruling by Judge Rice and what happened at trial. Trial counsel make these kinds of game-day decisions all the time as to which evidence to focus on. I spent 18 years as a trial court judge. I understand. I tried cases before that. I understand that pretty well. And our trial counsel, the marijuana evidence, they made the decision that they didn't want to emphasize it at trial. So they started off setting that foundation, but the case was taken over. Isn't your argument really harmless there? I mean, I don't see how this is defensible. I don't want to be pedantic, but let me just read you from 401. The definition of relevant evidence, it means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Once the defense expert said marijuana had no effect here, no consequence, right? No consequence under 401. Marijuana evidence had no consequence. You had no other evidence to suggest that it did, did you? Well, no. Dr. Holden did testify, and it was questioned about this, that there were risk factors in Ms. Juga's pregnancy, including her age, and he mentioned drug use, but that just ended up not being a focus of the trial. And you had her own admission that she had no prenatal care, sought no prenatal care for about the first four and a half months of her pregnancy or whatever it was. Right. And that's an alternate theory of causation, and that was before trial nobody could have predicted how the jury would react to the trisomy evidence or how the expert's testimony would have gone down. So we had that option open as to show an alternate potential cause of this miscarriage due to natural causes and not due to any alleged interaction with the police officers that night. It ended up not being the focus. The trisomy evidence is what took over the case. And just also on the prejudice side. But not only is there no focus as to marijuana, there's no relevancy as to marijuana. Well, respectfully, I would disagree that it was an alternate theory of causation. It certainly was not as strong as the trisomy evidence, which was overwhelming. What was the evidence? What evidence supports any causal nexus? The fact that it's a risk factor, that it's a risky behavior during pregnancy. Without any testimony, without any evidence suggesting its probability, generally, as a risk factor, its probability as to this plaintiff as a risk factor. Well, respectfully, the standard for relevance is not that we have to prove our case before we prove our case. We made a credible showing before trial. Judge Rice, in his discretion, found that that showing outweighed any potential prejudice. It was also Judge Rice's discretion to consider modern attitudes towards marijuana use and understand that it's quite commonplace nowadays. So it's on par with cigarettes, which the plaintiffs didn't seek to exclude. But Ms. Trujillo did smoke cigarettes during part of her pregnancy. So in weighing that calculus, there's enormous discretion afforded to the trial court. And that was the basis on which Judge Rice made his decision. Now, to the extent that Dr. Holden at trial saying, I don't think the marijuana was a factor in this particular miscarriage, to the extent that changed anything, it was incumbent upon the appellants to object, to move for a mistrial, to seek a limiting instruction, to do something to prevent the error before the jury retired so that they could not come up later on appeal and claim error based on something that could have been prevented at the trial court level. They've been asked about that. So, right. And just to emphasize again that the totality of the evidence, it is, you know, there's a harmless error argument here because really this, the marijuana evidence ended up being a footnote in this trial. Defense counsel mentioned it a grand total of three times, very brief references. Every single time was in the context of Ms. Shuge's risk factors. It was never used to attack her character, to attack her credibility. It doesn't have to be. You just put it out there and let the trial, the jurors, however many there were here, when they go in to deliberate, let's take care of it for you. You don't have to jump up and down on it. Right. You can plant the seed. I just wanted to emphasize because I think there's been the suggestion that defense counsel was waving in the jury's face and they were absolutely restrained and appropriate and used it only for its medical use every single time. I never suggested that. My curiosity has been the record of testimony. It's used during a witness's testimony and, as you referred to, the failure of plaintiff's counsel to do anything about it. Right. Do you think it's okay for defense counsel to mention it, even in passing, if it's not relevant? Well, respectfully, we believe it was relevant. Your expert said it wasn't. I'm sorry? Your expert said it wasn't. He said it wasn't relevant in this case. He didn't say that marijuana never. Right. Right. That marijuana's never. It's the only case that matters. Right. But that's the thing. This is an alternate theory. No, it's not relevant in this case. No other case matters. Right? Right. This is the only case the jury's considering. So if the expert says it doesn't matter in this case, you can't talk about other cases. So is it appropriate for counsel to then bring it up, even in passing? Again, it was an alternate theory of causation. So his Dr. Holden's opinion was based on the Tristan. Based on what? A theory based on what? Just that there's other natural causes for a miscarriage. What my colleagues are saying is on this record, it's not an alternate theory because it doesn't apply to this particular plaintiff. In the abstract, if it is an alternate theory, isn't alternate meaning in the abstract it could be an alternate cause. Why is it not a request that the jury speculate that in this case it did have some effect, where you have no testimony suggesting a causal nexus? Again, it's a factor. It's a risk factor. And I think the jurors understand that pregnant women are warned to abstain from certain activities because it is risky. I don't think we need it. That's exactly the problem. Jurors know that pregnant women shouldn't engage in certain kinds of behavior. This woman is engaging in certain kind of behavior that's illegal. Giving some cigarettes. And it really does run the risk of the whole reason we have a 404B restriction on evidence coming in. They're going to think she's a lousy mother. Can't be very sympathetic to her. Well, again, this is a discretionary balancing test. And it does rule 401 standard is fairly generous. It says it's just likely to make a relevant fact more or less probable. But see, that's the problem. Because on this record, it's not likely that it had any impact. All the evidence is as to this plaintiff had no impact. So the fact that 401 says what it says and 403 says what it says doesn't really help you. Because in this universe, not an alternate universe, in this universe, it did not make a difference. Well, because in Judge Holden's opinion, because the trisomy was the problem, but Judge Holden also confirmed that marijuana is risky behavior during pregnancy. And he advises his pregnant patients not to use it. So I don't think it's fair to say that Judge Holden completely abandoned the idea or disagreed with the idea that marijuana is a risk factor. He embraced that. But his focus was on the trisomy, and the focus of the trial was on the trisomy. So this just wasn't a factor at trial. It was mentioned a few times. It was let drop. Right. The focus was on the trial. That's what caused the pregnancy, not marijuana, right? That was the focus of the trial. Right. That was Judge Holden's. Then we go back to square one. How is the marijuana relevant in this case? It's not. Well, again, it's another factor that could have caused a miscarriage. If the jury had reacted to Judge Holden conveying with their body language that they thought he was full of it, that would have been our fallback position. But your best position, your best position, your strongest position for us is harmless heroin, right? Well, I think that is a very strong position because there's so much overwhelming evidence here. It wasn't what I asked, but that's fine. Well, again, I would defer again to the highly deferential standard of review and the great deference that's accorded to trial judges who are engaging in this Rule 403 balancing. I see my time is up. Thank you. Is there any further questions? Okay. Thank you. Was it harmless there? Was it harmless there? Yes, absolutely. Marijuana was harmless there. I knew it was going to come down here, but I didn't think it would come down here. You can't start with a strict question on a bottle like that. I don't think it's time for lunch. They said the clock didn't start yet. We'll forget you said it. Let's start again. Was it harmless there? No, it was not. It was harmful. It harmed the jury's decision in this case. Like Judge McKee mentioned, it's an illegal practice. The jury judged her credibility as a mother, as an expecting mother, for continuing to use an illegal drug. The jury also had the testimony of expert witnesses from testimony from the defense witness about trisomy and its impact and when it would impact. I mean, those percentages of even survival were pretty powerful. And then the jury had the testimony from the admission of the mother herself that she had not sought prenatal care. That's strong stuff, isn't it? I mean, you really think that the jury would have weighed the marijuana usage to such a strong degree that it would overcome those other factors that I referred to? That's your position? Yes, I think so. It is unlike going to see prenatal care. That's not something that you're doing that can affect theoretically, whether there's evidence of it or not, theoretically affect the fetus itself. This is saying that she did something to affect her own pregnancy and harm it. That's the way the jury could interpret it. That's the way they tried to frame it by calling it a risk factor, even though it had nothing to do with the miscarriage. There was other testimony, too, wasn't there, about whether or not the traumatic event here, that's my term, that occurred with the door would have been sufficient to have caused an abruption. There was evidence to that extent, wasn't there? There was evidence on the defense side, at least through questioning, that it wasn't enough, right? Right. I think that could have impacted her credibility as well, in a negative fashion. I'm not saying that the marijuana use was the only component that affected credibility, but it was still a substantial component that affected credibility. And here you were talking about the gestational age. Plaintiff's expert explained that for all women, the highest likelihood, 99 percent of pregnancies, are lost in the first or the third trimester. And Ms. Shuja was in her second trimester. She was 18 and a half weeks, four and a half months. In the NIH article, Judge McKee, you mentioned this gestational age being an issue, that it was talking about risk factors for being over 20 weeks. At the time of the motion to eliminate a decision, the gestational age was not brought in front of Judge Rice. It wasn't in the motion to eliminate opposition. The gestational age wasn't even part of Dr. Holden's written expert opinion. He didn't mention the age. But the age was all over all of the medical records. And they all said that there was 18 and a half weeks. And I think Dr. Cohen explained that any kind of growth deficiencies that happen is later on, after 20 weeks or whatever, however long, but it would have happened at a later point in time. So it wouldn't have affected the age of the fetus. And they talk about not knowing, Ms. McNaughton mentioned not knowing how the expert testimony was going to unfold at trial. It was their expert, and if they wanted to say that it was relevant, they could have and they should have put it in through him, but they couldn't because he knew it wasn't relevant. And that was the case even before at the motion to eliminate stage. I did want to say a couple of things about the medical records in terms of ways they could have come in. One, they did attack Ms. Huger for recent fabrication about her symptoms, saying that she had to walk this tightrope of saying her symptoms were bad enough that they caused her miscarriage, but that they didn't necessitate her calling. Were those arguments presented to the judge with any specificity? In other words, we want this particular record in, and this is our theory of admissibility. They were not. Isn't that your obligation? In this case, when the rule- Especially because Judge Rice, as I have indicated more than once in questioning, did not impose a categorical exclusion of the medical records, which allows you an implicit invitation to come forward and say, Judge, we would like to seek admission. We're going to proffer this particular exhibit. In this case, to demonstrate a prior consonant statement. It was clear to all trial counsel, and I was trial counsel, that the medical records had been excluded. It was, as they mentioned, it was referenced in the pretrial memos, and it was discussed extensively about them not being allowed in this trial. We don't have a record of those. I wish I could cite to the discussions we had about those. But you can glean that that was the rule in the opening arguments, when they said, you're going to see the medical records from the providers in this case. And I raised my hand and said, Your Honor, they just said they're going to see the records. And he said, no, no, no, no, that's not what she said. And because of my ruling, we're not going to admit these. It was clear to everybody there that the medical records were excluded. And so we didn't have an opportunity to try and get a subpoena record custodian to come in to satisfy the business record. We couldn't try to get them in through Rule 703, as the medical experts both relied on the same set of records, specific ones inside the 100-plus pages. And so it would have made sense to admit them under Rule 703, because both experts are talking about this pathology report, for example, and they're saying it means different things, but the jury didn't have anything to ground them in it. And they stated twice, their expert mischaracterized the records twice, one saying that the pathology report said that there wasn't an abruption, another time saying that the chief obstetrician on service said that there was not an abruption. But that wasn't in the medical records, and we couldn't use the medical records themselves to impeach the experts. And that was also prejudicial, and it also prevented us from rehabilitating the credibility in this case. Thank you, gentlemen, and pro bono on this case, and we thank you. Your services are greatly appreciated. Thank you, Your Honor.